UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HUMBERTO CASTILLO DIAS<br><br>Petitioner,<br><br>v.<br><br>RAYTHEL FISHER,<br><br>Respondent. | No. 2:20-cv-0410 JAM DB P<br><br><br>FINDINGS AND RECOMMENDATIONS |

Petitioner, a state prisoner, proceeds pro se and in forma pauperis seeking a writ of habeas corpus under 28 U.S.C. § 2254. Petitioner challenges a judgment entered in the Solano County Superior Court convicting him of oral copulation with a child under 10. Petitioner claims his due process rights were violated by the admission of evidence pertaining to Child Sexual Abuse Accommodation Syndrome ("CSAAS") and the trial court's refusal of a defense-proposed modification to a jury instruction. As discussed below, it is recommended that the petition for a writ of habeas corpus (ECF No. 1) be denied.

## BACKGROUND

**I.     Facts Established at Trial**

The California Court of Appeal provided the following summary of the trial evidence:

**The Victim's Testimony**

Dias's first trial ended in a mistrial when the jury was unable to agree

1

on a verdict. The following evidence is from Dias's retrial. We will discuss only the evidence and proceedings relevant to the admissibility of the CSAAS evidence and the alleged instructional error—the two discrete issues raised in this appeal.

The victim was nine years old when she testified. In 2011, when she was seven years old, Dias was married to her mother. The couple later divorced, but Dias continued to spend time with the victim at Mother's home.

The victim described an occasion when she was watching television while Dias was in Mother's bedroom. The victim got tired, so she changed into her pajamas, went into the bedroom and got under the covers. Dias was under the blanket. The prosecutor asked the victim if anything unusual happened when she got into the bed. The victim said she needed a break.

After a brief recess the prosecutor again asked the victim what happened when she was in the bed with Dias. The victim said that Dias looked at her. Asked what happened next, she repeatedly said she could not remember except that Dias got out of bed after a couple of minutes and went to the bathroom. The court recessed the trial for the day and Mother was admonished not to discuss the case with the victim.

When proceedings resumed the defense counsel disclosed that the victim and Mother had spoken with the victim advocate after the prior day's testimony. The victim told the advocate that she was scared to see Dias, and asked, "'Are you going to let him out?'" The advocate responded that the victim "'needed to answer the questions truthfully and that we are trying to make sure she never has to see him again.'" Mother said that Dias "'will get out and come to their house'" if the victim did not tell the truth. Defense counsel moved for mistrial on the ground that the victim had been coached or at least subjected to her mother's undue influence. The court observed that the statements raised such a concern but denied the motion and commented that Dias could question the victim about them.

When questioning resumed the victim continued to respond, "I forgot," when asked what happened next. The prosecutor asked if Dias touched her while she was on the bed. The victim said no. The prosecutor asked about the victim's conversation with the victim advocate the previous day. The victim said she forgot. The court called another recess.

After the recess the prosecutor resumed questioning the victim about what happened on the bed. This time the victim said she remembered. She testified that Dias pulled down his boxer shorts and her pajamas and underwear. Facing her, he held his "bird" or "private" with his hands, rubbed cream from a green bottle with an apple on the label onto his penis, and "put his private in [hers]." Dias moved his penis slowly back and forth and put his tongue in the victim's mouth. The victim felt pain in her genitals and saw "white stuff" come out of Dias's penis onto their legs and the bed. Dias wiped it up with a tissue or paper towel.

2

////

After Dias left the house, the victim told Mother what he had done. Mother told her to write it down, but she said they had to keep it a secret. The victim wrote what happened on a piece of paper, but she left her note behind when the family moved to a new house.

On cross-examination, the victim acknowledged that her mother, therapist Pamela Cooke, the prosecutor and two victim advocates had talked to her about what she was supposed to say in court.

**The Victim's Pretrial Statements**

Pamela Cooke counseled the victim's younger brother Daniel in 2012. On July 24, 2012, when the victim was seven, Mother, panicked and tearful, told Cooke that the victim had just disclosed that Dias molested her. Cooke spoke with the victim, who told her about an incident when Dias told her to take a shower, pushed his tongue into her mouth "and then he pushed his pee-pee into her mouth and stuff came out." The victim said this had happened six or seven times but Cook questioned the statement's reliability because the victim had become distracted and upset. The victim also said Dias would sometimes take down his underwear and "push his pee-pee into her face." Cooke reported this to Children's Protective Services.

Cooke met with the victim again on September 11, 2012. The victim told her "'[i]t hurt a whole lot when [Dias] pushed his pee-pee against her pee-pee.'" The victim spoke about being worried Dias would come to the door.

A social worker interviewed the victim at home on July 31, 2012. The victim pointed to a room where she said her stepfather had done something to her that she did not like. The victim recounted that she had become tired while watching television, so she went into the bedroom and lay down. Dias came in, lifted her up, put his penis in her mouth and asked her to move her tongue around. The social worker asked the victim if any sexual acts had occurred before July 24, 2012. The victim answered, "I forgot."

A forensic interview of the victim was conducted on August 7, 2012. A recording of the interview was played at trial and a transcript was distributed to the jury. Appellate counsel for both parties acknowledge correctly that the transcript of the interview contains numerous inconsistencies and non-sequiturs by the victim.

The victim told the interviewer that Dias had picked her and her brother up from their babysitter's. The victim watched television until she became tired and went into the bedroom. Dias came into the room wearing only his underwear, grabbed her by the waist, pushed her head down and put his "peep" in her mouth. After that, the victim told the interviewer, she pulled her pants down; she did not know why. Dias put his "peep" inside the victim's "peep" and moved it faster and faster until he stopped and "[t]he white stuff came out."

The victim said Dias put his "peep" in her "peep" "millions of times,"

3

starting when she was in first grade. She said "the white stuff" only came out in her mouth just once. Dias also put his tongue in her mouth. Dias put his "peep" in her mouth "[a] lot" of times, and put slimy and sticky "green stuff, like it's a apple" on his "peep."

The interviewer asked whether the victim ever told anyone about the molestation. She responded, "I forgot to say it because I didn't remember [¶] ... [¶] but now I told it to my mom." She also said, "I keep it a secret on my paper." It is a "tiny little paper [¶] ... [¶] and it has happy faces." She said her mother gave it to her, and that her mother "was happy when she gave it to me."

**Expert Testimony**

**Dr. Urquiza**

Psychologist Anthony Urquiza testified for the prosecution as an expert on CSAAS. He acknowledged he had no knowledge of the facts of this case.

CSAAS was initially identified by Dr. Roland Summit in a peer reviewed article written for the purpose of dispelling therapists' common misperceptions about sexually abused children. According to Dr. Urquiza, victims of child sexual abuse typically demonstrate five common characteristics: secrecy; helplessness; entrapment and accommodation; delayed and unconvincing disclosure; and retraction or recantation. Entrapment and accommodation relate to the fact that child sexual abuse usually occurs within the context of an ongoing relationship. Children in such abusive relationships are unable to protect themselves from the abuser. To accommodate or cope with their feelings of shame, trauma, disgust and humiliation, they may dissociate, or "distanc[e] them[selves] from what's going on." In other words, the victim tries to suppress the experience to "shut it down and not feel it anymore." This process "essentially detaches [such children] from their emotions. It's not like they don't have them; it's that they don't feel them at the moment, and so they look like they are emotionless, and that's why they come to therapy."

As to delayed and unconvincing disclosure, Dr. Urquiza testified that an enormous amount of research shows that a sexually abused child will commonly delay disclosing the abuse, sometimes for months or years. Children are generally afraid to tell someone about the abuse, and their reports may seem unconvincing for several reasons. They may present the information in a piecemeal fashion, e.g., "'My Uncle Bob touched me in a bad way,' and then it's followed by another statement that has more information if they feel like it's okay for them to talk about it, and as they continue to feel safe and okay to make that disclosure, more and more information about the abuse comes out. [¶] And if you look at it as there is a first disclosure and a second and third and fourth and they have different stories, it may look unconvincing. Hence, the term unconvincing disclosure. What [Dr. Summit] is really talking about is a process kids go through in being able to disclose being abused. [¶] In some instances they may make mistakes, errors in disclosure because of their age and inability to retain specific information, and they are not focusing on things

4

like what time it is or how long something lasted."

**Dr. Coleman**

Psychiatrist Lee Coleman testified for the defense as an expert in (1) memory suggestibility and potential influence on memory by suggestive interviewing techniques in the investigation of child sexual abuse cases; (2) medical exams in sexual abuse cases; and (3) the accommodation syndrome.

Dr. Coleman described some of the general characteristics of human memory. Memory can be influenced by a person's biases and prejudices, other people, and subsequent events. Children are more susceptible to such influences than adults and young children are generally the most susceptible. According to Dr. Coleman, the way adults interact with a suspected child abuse victim may unwittingly promote the formation of false, even if genuinely believed, memories of the underlying incidents. If a person questioning the child has a preconceived belief about what happened, he or she may influence the child's memory by repeating questions and positively or negatively reinforcing the child's responses "so that ... the child can begin to learn what it is the adult thinks, what it is that will please them or they confirm what it is they think" and "what you think might have happened can quickly become what you are convinced did happen because that is what the people you are talking to seem to reward you for talking about." Dr. Coleman had reviewed the recording of the victim's forensic interview and opined that the interviewer employed questioning techniques that, in his experience, affect children's memories.

Dr. Coleman spoke critically of CSAAS. He said the theory is not based on scientific data and is not helpful in determining whether or not an alleged incident of abuse occurred. Dr. Coleman criticized Dr. Summit, the original proponent of CSAAS, for (1) focusing only on situations where adults reject the child's report of abuse and support the accused instead; and (2) wrongly asserting that children never make false allegations of abuse. Dr. Coleman disagreed with Dr. Urquiza's view that only a very small minority of mental health and legal professionals are critical of the concept of CSAAS. He also opined that the allegation that Dias penetrated the victim's vagina with his penis was inconsistent with the lack of any reported pain, bleeding, bruising or tenderness.

**[Defense Counsel's Argument]**

Defense counsel argued that the victim's accusations against Dias were the product of Mother's coaching and suggestive interviews by mental health and law enforcement personnel. Moreover, he argued, the victim's allegations were inconsistent with the physical evidence and testimony of multiple witnesses who spoke to Dias's good character and love for his children.

People v. Dias, No. A144802, 2018 WL 6716526, at *1-4 (Cal. Ct. App. Dec. 21, 2018).

////

5

II. **Procedural Background**

A. **Judgment**

The jury acquitted petitioner of sexual intercourse with a child under 10 and convicted him of oral copulation with a child under 10. Dias, 2018 WL 6716526, at *4. The trial court imposed an indeterminate prison term of 15 years to life. Id.

B. **State Appeal, State Habeas, and Federal Proceedings**

Petitioner timely appealed his convictions, unsuccessfully raising the grounds addressed herein. (ECF No. 15-16 at 1.) He then sought review in the California Supreme Court. (Id. at 182.) On March 13, 2019, the California Supreme Court summarily denied review. (Id. at 254.)

The present petition was filed on February 24, 2020. (ECF No. 1.) Respondent has filed an answer opposing petitioner's claims. (ECF No. 15.)

**STANDARDS OF REVIEW APPLICABLE TO HABEAS CORPUS CLAIMS**

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). A federal writ is not available for alleged error in the interpretation or application of state law. See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision.

Greene v. Fisher, 565 U.S. 34, 37 (2011); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)). Circuit court precedent "'may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably.'" Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)). Circuit precedent may not, however, be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." Marshall v. Rodgers, 569 U.S. 58, 64 (2013) (citing Parker v. Matthews, 567 U.S. 37 (2012)). Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct." Id. at 1451. If courts of appeals have diverged in their treatment of an issue, then it cannot be said that there is "clearly established Federal law" governing that issue. Carey v. Musladin, 549 U.S. 70, 76-77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003) (quoting Williams, 529 U.S. at 405-06). "Under the 'unreasonable application' clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e] [Supreme] Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.'" Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (quoting Williams, 529 U.S. at 413).

Under 28 U.S.C. § 2254(d)(1), "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, 529 U.S. at 411; see also Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Andrade, 538 U.S. at 75. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

7

There are two ways a petitioner may satisfy subsection (d)(2). <u>Hibbler v. Benedetti</u>, 693 F.3d 1140, 1146 (9th Cir. 2012). He may show the state court's findings of fact "were not supported by substantial evidence in the state court record" or he may "challenge the fact-finding process itself on the ground it was deficient in some material way." <u>Id.</u> (citing <u>Taylor v. Maddox</u>, 366 F.3d 992, 999-1001 (9th Cir. 2004)); <u>see also</u> <u>Hurles v. Ryan</u>, 752 F.3d 768, 790-91 (9th Cir. 2014). Under the "substantial evidence" test, the court asks whether "an appellate panel, applying the normal standards of appellate review," could reasonably conclude that the finding is supported by the record. <u>Hibbler</u>, 693 F.3d at 1146. The second test, whether the state court's fact-finding process is insufficient, requires the federal court to "be satisfied that any appellate court to whom the defect [in the state court's fact-finding process] is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate." <u>Id.</u> at 1146-47 (quoting <u>Lambert v. Blodgett</u>, 393 F.3d 943, 972 (9th Cir. 2004)).

If a petitioner overcomes one of the hurdles posed by section 2254(d), this court reviews the merits of the claim de novo. <u>Delgadillo v. Woodford</u>, 527 F.3d 919, 925 (9th Cir. 2008); <u>see also</u> <u>Frantz v. Hazey</u>, 533 F.3d 724, 735 (9th Cir. 2008) (en banc). For claims upon which a petitioner seeks to present evidence, the petitioner must meet the standards of 28 U.S.C. § 2254(e)(2) by showing that he has not "failed to develop the factual basis of [the] claim in State court proceedings" and by meeting the federal case law standards for the presentation of evidence in a federal habeas proceeding. <u>See</u> <u>Cullen v. Pinholster</u>, 563 U.S. 170, 186 (2011).

This court looks to the last reasoned state court decision as the basis for the state court judgment. <u>Stanley</u>, 633 F.3d at 859; <u>Robinson v. Ignacio</u>, 360 F.3d 1044, 1055 (9th Cir. 2004). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." <u>Richter</u>, 562 U.S. at 99. This presumption may be overcome by showing "there is reason to think some other explanation for the state court's decision is more likely." <u>Id.</u> at 99-100 (citing <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803 (1991)). Similarly, when a state court decision on a petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court must presume, subject to

8

rebuttal, that the federal claim was adjudicated on the merits. Johnson v. Williams, 568 U.S. 289, 293 (2013). If it is clear a state court has not reached the merits of a petitioner's claim, then the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court reviews the claim de novo. Stanley, 633 F.3d at 860; Reynoso v. Giurbino, 462 F.3d 1099, 1109 (9th Cir. 2006); Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).

## ANALYSIS

**I. CSAAS Evidence**

The jury was instructed as follows about considering CSAAS evidence:

> You have heard testimony from Dr. Anthony Urquiza regarding child sexual abuse accommodation syndrome. Dr. Anthony Urquiza's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him. You may consider this evidence only in deciding whether or not V.U.'s conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of his [*sic*] testimony.

(ECF No. 15-3 at 160-61 [Reporter's Transcript ("RT") 1958-59]; 15-13 at 207 [Clerk's Transcript ("CT") 293].)

Petitioner argues that based on the foregoing instruction, the CSAAS evidence was likely to have been improperly considered by the jury as circumstantial proof of guilt. He argues that CSAAS evidence is not reliable, that some states do not allow it, and that its admission violated his right to due process. He asserts the substantial and injurious effect of the alleged error is reflected by the jury's failure to reach a verdict at his first trial, during which CSAAS evidence was not admitted. (Id. at 8, 34, 38.)

**A. State Court Opinion**

On direct appeal, petitioner claimed the trial court should have excluded Dr. Urquiza's testimony about CSAAS under California's Kelly-Frye[1] test, which requires that expert testimony based on a new scientific technique be shown reliable in that it is generally accepted in the relevant scientific community. See People v. Harlan (1990) 222 Cal.App.3d 439, 448. Petitioner

---

[1] *People v. Kelly*, 17 Cal.3d 24 (1976); *Frye v. United States*, 296 F. 1013 (D.C. Cir. 1923).

9

further claimed the trial court's decision violated California Evidence Code section 352 and his right to due process of law. The California Court of Appeal rejected these contentions:

> **[I. Expert Testimony]**
>
> "The *Kelly* standard… is designed to address 'scientific evidence or technology that is so foreign to everyday experience as to be unusually difficult for laypersons to evaluate.' [Citation. ¶] In contrast, when an expert's methods are based on everyday processes of observation and analysis, we trust jurors to rely on their own common sense and good judgment in evaluating the weight of the evidence presented to them.'" (*People v. Lucas* (2014) 60 Cal.4th 153, 223-224 (footnote omitted), disapproved on another point in *People v. Romero* (2015) 62 Cal.4th 1, 53 fn. 19.)
>
> Over the past 30 years numerous California courts of appeal have held that expert testimony about CSAAS is not subject to the requirements of *Kelly-Frye* when offered, not as proof that a molestation occurred, but to rehabilitate a child's credibility when the defense suggests that his or her conduct after the incident is inconsistent with having been abused. (*See People v. McAlpin* (1991) 53 Cal.3d 1289, 1300-1301 & fn. 4 (*McAlpin*) [citing collected cases]; *People v. Gray* (1986) 187 Cal.App.3d 213, 219-220 (*Gray*); *Harlan*, *supra*, 222 Cal.3d at pp. 448-449; *People v. Wells* (2004) 118 Cal.App.4th 179.) Thus, as we observed in *Wells*, *supra*, 118 Cal.App.4th at p. 188, CSAAS testimony is admissible "for the limited purpose of disabusing a jury of misconceptions it might hold about how a child reacts to a molestation" and "must be tailored to address the specific myth or misconception suggested by the evidence."
>
> *Gray*, *supra*, 187 Cal.App.3d 213, is instructive. [….] *Gray* emphasizes that there is a material difference between "expert testimony" and "scientific evidence" for purposes of *Kelly-Frye*: "'When a witness gives his personal opinion on the stand—even if he qualifies as an expert—the jurors may temper their acceptance of his testimony with a healthy skepticism born of their knowledge that all human beings are fallible. But the opposite may be true when the evidence is produced by a machine: like many laypersons, jurors tend to ascribe an inordinately high degree of certainty to proof derived from an apparently "scientific" mechanism, instrument, or procedure. Yet the aura of infallibility that often surrounds such evidence may well conceal the fact that it remains experimental and tentative.'" (*Gray*, *supra*, 187 Cal.App.3d at p. 219-220, quoting *People v. McDonald* (1984) 37 Cal.3d 351, 372 (*McDonald*) [holding *Kelly-Frye* does not apply to expert testimony on eyewitness identification], overruled on another point in *People v. Mendoza* (2000) 23 Cal.4th 896, 914.)
>
> The CSAAS evidence, *Gray* observes, was more akin to expert testimony informing the jury of certain factors that may affect an eyewitness identification—which is not subject to the *Kelly-Frye* test—than to "'scientific evidence... derived from an apparently "scientific" mechanism, instrument, or procedure." (*Gray*, *supra*,

10

187 Cal.App.3d at pp. 219-220.) Moreover, "[w]e have never applied the *Kelly-Frye* rule to expert medical testimony, even when the witness is a psychiatrist and the subject matter is as esoteric as the reconstitution of a past state of mind or the prediction of future dangerousness, or even the diagnosis of an unusual form of mental illness not listed in the diagnostic manual of the American Psychiatric Association.'" (*Id.* at p. 220.) Applying the Supreme Court's reasoning in *McDonald*, *supra*, 37 Cal.3d 351, to the CSAAS testimony before it, the court held that general testimony about traits and characteristics of child molestation victims as a class does not fall into the category of scientific evidence for purposes of *Kelly-Frye* when introduced for the limited purpose of rebutting a suggestion that a child's behavior is inconsistent with abuse. (187 Cal.App.3d at p. 220.)

Since *Gray*, California courts have consistently authorized the admission of CSAAS evidence to disabuse a jury of possible misconceptions about a child's reaction to and reporting of sexual abuse. (*See, e.g., Harlan*, *supra*, 222 Cal.App.3d at pp. 448-450; *Wells*, *supra*, 118 Cal.App.4th 179, 188-190; [additional citations].

The Supreme Court has also signaled its agreement with the cases allowing expert testimony to describe common reactions to sexual abuse. In *McAlpin*, *supra*, 53 Cal.3d 1289, the Court held a police officer could properly testify that it is not unusual for parents to refrain from reporting a known molestation of their child. (*Id.* at pp. 1300-1301.) The Court noted its recognition in *Bledsoe*, *supra*, 36 Cal.3d 236, that expert testimony on rape trauma syndrome, although inadmissible to prove the complaining witness had been raped, is admissible to rehabilitate the witness when the defense impeaches her by suggesting her post-incident conduct was inconsistent with having been raped. "'"[I]n such a context expert testimony on rape trauma syndrome would play a particularly useful role by disabusing the jury of some widely held misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of popular myths." (*Id.* at p. 247-248.)

In the Court's view, expert testimony on CSAAS provides "[a]n even more direct analogy." (*McAlpin*, *supra*, 53 Cal.3d at p. 1300.) [….] Although [*McAlpin*] concerned the failure of the parent, rather than the child, to report abuse, the Court held the rule developed in the context of CSAAS was equally applicable. (*McAlpin*, *supra*, 53 Cal.3d at p. 1301.) More recently, the Court cited *McAlpin* (and *Housley*, *supra*, 6 Cal.App. at pp. 955-956) with approval in *People v. Brown* (2004) 33 Cal.4th 892, 905-906 in extending the same principles to expert testimony about the common behaviors of domestic violence victims. [… ¶]

Dias alternatively asserts the court abused its discretion when it declined to exclude the CSAAS testimony under section 352. We disagree. The court expressly limited the CSAAS evidence to "those areas that are relevant to dispel potential misperceptions on the part of jurors." Before Dr. Urquiza testified, the court clarified that the three specific areas raised by the prior testimony were "failure to

11

> promptly report, withholding of information, and inconsistent statements. [….]
>
> Dias did not object to the court's identification of these areas as relevant in light of the prior testimony, and he does not so argue on appeal. His argument, instead, is that CSAAS lacks any probative value because it is "junk science." The view that CSAAS must be qualified as scientific evidence has been rejected, explicitly and implicitly, in *Gray* and the many cases that follow it. [Citations.] Dias's assertion that the evidence was unduly prejudicial also fails to persuade. "[T]he test for prejudice under Evidence Code section 352 is not whether the evidence in question undermines the defense or helps demonstrate guilt, but is whether the evidence inflames the jurors' emotions, motivating them to use the information, not to evaluate logically the point upon which it is relevant, but to reward or punish the defense because of the jurors' emotional reaction." (*People v. Valdez* (2012) 55 Cal.4th 82, 145; *Vorse v. Sarasy* (1997) 57 Cal.App.4th 998, 1008-1009.) Dr. Urquiza testified generally about how children likely respond to sexual abuse. He did not discuss the victim or relate his testimony about CSAAS to her behavior; to the contrary, he testified that he knew nothing about the underlying facts in the case. His general testimony could hardly have exacerbated the emotional impact of the victim's direct testimony and videotaped forensic interview. Moreover, Dias cross-examined Dr. Urquiza extensively about the validity and limitations of CSAAS and was allowed to rebut Dr. Urquiza's testimony through Dr. Coleman, whom the court observed "is very capable of completely undercutting Dr. Urquiza and Dr. Summit's theories." For these reasons, the court's admission of Dr. Urquiza's expert testimony was neither an abuse of discretion under section 352 nor fundamentally unfair.

Dias, 2018 WL 6716526, at *4-7.

**B. Discussion**

Under the federal standard, expert witnesses may testify if they are qualified and if their testimony will assist the trier of fact in understanding the evidence or determining a fact in issue. United States v. Amaral, 488 F.2d 1148, 1152-53 (9th Cir. 1973). Conversely, expert testimony should not be permitted if it concerns an improper subject for expert testimony such as one that invades the province of the jury. Id. at 1153 (holding that expert testimony on the unreliability of eyewitness testimony was properly excluded).

Credibility is a matter to be decided by the jury. See United States v. Barnard, 490 F.2d 907, 912-13 (9th Cir.1973) (holding that the trial court properly excluded psychiatric and psychological testimony as to the credibility of codefendant, a prosecution witness). In general, though, the alleged improper admission of evidence in a state trial does not raise a cognizable

federal habeas issue. Petitioner cites no specific Supreme Court authority to support his claim that the CSAAS evidence violated his right to due process. The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process:

> Although the Court has been clear that a writ [of habeas corpus] should be issued when constitutional errors have rendered the trial fundamentally unfair [Citations], it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ.

Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009).

Accordingly, habeas relief lies for the admission of prejudicial evidence only if the admission was fundamentally unfair and resulted in a denial of due process. Estelle, 502 U.S. at 72; Pulley v. Harris, 465 U.S. 37, 41 (1984); Walters v. Maas, 45 F.3d 1355, 1357 (9th Cir. 1995); Jeffries v. Blodgett, 5 F.3d 1180, 1192 (9th Cir. 1993), cert. denied, 510 U.S. 1191 (1994). An alleged failure to comply with state rules of evidence is neither a necessary nor sufficient basis for granting federal habeas relief on due process grounds. Jammal v. Van de Kamp, 926 F.2d 918, 919-920 (9th Cir. 1991). Only if there are no permissible inferences that the jury may draw from the evidence can its admission rise to the level of a due process violation. Id. at 920.

Federal courts have found error when construing the Federal Rules of Evidence if the expert testifies that the victim himself or herself was telling the truth about the sexual abuse. See, e.g., United States v. Binder, 769 F.2d 595, 602 (9th Cir. 1985) ("The testimony of the experts... was not limited to references to psychological literature or experience or to a discussion of a class of victims generally. Rather the experts testified that these particular children in this particular case could be believed. The jury in effect was impermissibly being asked to accept an expert's determination that these particular witnesses were truthful."). Where the expert's testimony does not focus on the truthfulness of the specific witnesses, but rather on "general behavior characteristics that may be exhibited in children who have been sexually abused," i.e., to a "class of victims generally," however, such testimony is permissible and does not invade the province of the jury as the finder of truthfulness and veracity. United States v. Hadley, 918 F.2d 848, 852 (9th Cir. 1990). In addition, the Ninth Circuit upholds the use of CSAAS evidence in child abuse cases

13

against due process challenges "when the testimony concerns general characteristics of victims and is not used to opine that a specific child is telling the truth." Brodit v. Cambra, 350 F.3d 985, 991 (9th Cir. 2003); United States v. Bighead, 128 F.3d 1329, 1330-1331 (9th Cir. 1997).

Petitioner's argument acknowledges that Dr. Urquiza's testimony described CSAAS in general terms, addressing the general characteristics of victims, rather than the minor victim in this case. Dr. Urquiza testified he did not know the minor victim and he did not offer an opinion as to whether or not her testimony was true. Dias, 2018 WL 6716526, at *7.

Petitioner asserts using CSAAS evidence to evaluate a minor victim's credibility is unfair because it is unreliable and because some state courts have excluded CSAAS evidence entirely. (ECF No. 1 at 30.) Even if an error of state law were shown, however, that could not be the basis for a finding that the evidence rendered the trial fundamentally unfair.

The challenged testimony complied with the limits set forth by the Ninth Circuit in that it concerned general characteristics of victims and the expert did not opine a specific child was telling the truth. E.g., Brodit, 350 F.3d at 991. Accordingly, its admission was neither fundamentally unfair nor resulting in a denial of due process. See Estelle, 502 U.S. at 72.

## II.     Pinpoint Instruction

Petitioner challenges the trial court's refusal to modify CALCRIM 330 in the manner requested by the defense. CALCRIM 330 is a pattern instruction governing evaluation of the testimony of children under the age of 10. At petitioner's trial, CALCRIM 330 instructed the jury as follows, with petitioner's proposed and rejected modifications in brackets and italicized:

> "You have heard testimony from a child who is age 10 or younger. As with any other witness, you must decide whether the child gave truthful and accurate testimony.
>
> "In evaluating the child's testimony, you should consider all of the factors surrounding that testimony, including the child's age [*while testifying and at the time of the alleged event; and evidence regarding possible influences on the child's testimony from outside sources*]; and level of cognitive development.
>
> "When you evaluate the child's cognitive development, consider the child's ability to perceive, understand, remember, and communicate.
>
> "While a child and an adult witness may behave differently, that difference does not mean that one is any more or less believable than

> the other. You should not discount or distrust the testimony of a witness just because he or she is a child. [*Likewise, you should not uncritically accept the testimony of a child simply because he or she is a child. You should apply all those factors relating to the general believability of witnesses in which I have already instructed you while taking into account the child's age and any evidence relating to this child's cognitive abilities*."]

Dias, 2018 WL 6716526, at *7.

The trial court rejected the proposed modifications on the ground that the relevant principles were already addressed in CALCRIM 226 on evaluating witness testimony.[2] Dias,

---

[2] CALCRIM 226 instructed the jury as follows:

> [Y]ou alone must judge the credibility or believability of the witnesses. In deciding whether testimony is true and accurate, use your common sense and experience. You must judge the testimony of each witness by the same standards, setting aside any bias or prejudice you may have. [¶] You may believe all, part or none of any witness's testimony. Consider the testimony of each witness and decide how much you believe. [¶] In evaluating a witness's testimony, you [may] consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony. [¶] Among the factors you [may] consider are: How well could the witness, see, hear or otherwise perceive the things about which the witness testified? [¶] How well is the witness able to remember and describe what happened? [¶] What was the witness's behavior while testifying? [¶] Did the witness understand the questions and answer them directly? [¶] Was the witness's testimony influenced by a factor such as bias or prejudice, a personal relationship with someone involved in the case or a personal interest in how the case is decided? [¶] "What was the witness's attitude about the case or about testifying? [¶] Did the witness make a statement in the past that is consistent or inconsistent with his or her testimony? [¶] How reasonable is the testimony when you consider all the other evidence in the case? [¶] Did other evidence prove or disprove any fact about which the witness testified? [¶] Did the witness admit to being untruthful? [¶] What is the witness's character for truthfulness? [¶] Has the witness engaged in other conduct that reflects on his or her believability? [¶] Do not automatically reject testimony just because of inconsistencies or conflicts. Consider whether the differences are important or not. People sometimes honestly forget things or make mistakes about what they remember. Also, two people may witness the same event yet see or hear it differently. [¶] If you do not believe a witness's testimony that he or she no longer remembers something, that testimony is inconsistent with the witness's earlier statement on this subject. [¶] If you decide that a witness deliberately lied about something significant in this case, you should consider not believing anything that witness says. Or if you think the witness lied about some things but told the truth about others, you may simply accept the part that you think is true and ignore the rest.

Dias, 2018 WL 6716526, at *7-8.

2018 WL 6716526, at *7. The trial court noted defense counsel was free to argue the concepts in the proposed modification and agreed to re-instruct the jury with CALCRIM 226. Id.

Petitioner asserts the refusal of his proposed modifications to CALCRIM 330 violated his right to due process. He argues the refusal to give the proposed modifications precluded the jury from having an instructional basis to evaluate the minor victim's credibility because the general instructions only "cover the same general area" and do not "explicitly address the points outlined in the proposed instruction." (ECF No. 1 at 37.)

**A. State Court Opinion**

The California Court of Appeal considered and rejected this claim.

> **[II. CALCRIM No. 330]**
>
> "A criminal defendant is entitled, on request, to an instruction 'pinpointing' the theory of his defense. [Citations.]" (*People v. Wharton* (1991) 53 Cal.3d 522, 570 (*Wharton*).) On the other hand, the trial court is only required to instruct the jury with legally correct statements of law that are not confusing, duplicative or argumentative. [Citations.] However, "[I]nstructions that attempt to relate particular facts to a legal issue are generally objectionable as argumentative [citation], and the effect of certain facts on identified theories 'is best left to argument by counsel, cross-examination of the witnesses, and expert testimony where appropriate.'" (*Wharton*, *supra*, at p. 570.) Thus, pinpoint instructions are permitted when they describe "'"the theory of the defense"'" but not if they "highlight "'specific evidence as such.'" [Citations.]" (*People v. Earp* (1999) 20 Cal.4th 826, 886.)"
>
> An erroneous refusal to give a properly requested pinpoint instruction is reviewed under the *Watson* standard of harmless error. (*People v. Watson* (1956) 46 Cal.2d 818, 836; *see Wharton*, *supra*, 53 Cal.3d at p. 571 & fn. 10 [failure to give pinpoint instruction does not constitute federal constitutional error if instructions given to jury permitted it to consider defense theory].) Accordingly, the error requires reversal only if it is reasonably probable that a result more favorable to the defendant would otherwise have been reached. (*People v. Watson*, *supra*, 46 Cal.2d at p. 836.) We are also mindful that the failure to give an instruction on even an essential issue "'may be cured if the essential material is covered by other correct instructions properly given.'" (*People v. Jo* (2017) 15 Cal.App.5th 1128, 1173-1174.)
>
> Here, the court was not required to modify the pattern instruction. Dias's first request was that the jurors be instructed to consider the victim's age at trial and "at the time of the alleged event." But the given instruction told the jury to consider the victim's age, and we see no reason to believe the jurors would understand that language to mean her age at trial or at the time of the offense, but not both. In any

16

event, there is no possibility the outcome would have been different had the court included the proposed language in the instruction because the jury undoubtedly would have considered the victim's age at both times. The jury observed the victim's trial testimony and watched the videotaped interview recorded when she was seven, some two years earlier. The prosecutor stressed in closing that the victim, then nine, was testifying about an incident that happened when she was seven. Defense counsel pointedly ascribed the victim's affect in the video to her age at that time: "Of course that is a seven-year old. She doesn't understand the magnitude of anything in terms of vindictiveness." Addressing discrepancies between the victim's taped interview and her trial testimony, defense counsel urged the jury not to discount the differences just because she was only seven at the time of the incident: "even a nine-year old shouldn't have forgotten such a traumatic event." In short, the jurors would plainly have considered the victim's age at both points in time whether or not they were specifically instructed to do so.

Dias also asserts the court erred when it declined to instruct the jurors to consider "evidence regarding possible influences on the child's testimony from outside sources." (Italics omitted.) Again, we disagree. That proposed language was argumentative to the extent it attempted to relate particular facts to the defense theory that Mother and other adults influenced the victim to fabricate her accusations. (*People v. Wharton*, *supra*, 53 Cal.3d at p. 570.) "[T]he effect of certain facts on identified theories 'is best left to argument by counsel, cross-examination of the witnesses, and expert testimony where appropriate.'" (*Ibid*.) The proposed language was also duplicative of CALCRIM No. 226, which instructs the jury to consider whether the witness's testimony was "influenced by a factor such as ... a personal relationship with someone involved in the case or a personal interest in how the case is decided."

Dias's proposed additions to the third paragraph of CALCRIM No. 330 suffer the same defect. The defense asked the court to instruct the jury not to "uncritically accept the testimony of a child simply because he or she is a child. You should apply all those factors relating to the general believability of witnesses in which I have already instructed you while taking into account the child's age and any evidence relating to this child's cognitive abilities." But CALCRIM Nos. 226 and 330, taken together, cautioned the jurors against assuming that any witness is trustworthy or untrustworthy, and told them to consider all possible factors relevant to the general believability of witnesses, including the child's age and cognitive development. An additional instruction cautioning the jury that testimony should not be uncritically believed simply because the witness was a child would have been superfluous. The court properly rejected Dias's proposed modifications.

Dias, 2018 WL 6716526, at *8-9.

////

////

**B. Discussion**

Jury instructions are generally state law issues. See Bradshaw v. Richey, 546 U.S. 74, 76 (2005). As such, a federal court is bound by a state appellate court's determination that a particular instruction was or was not warranted. See Id. ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); Williams v. Calderon, 52 F.3d 1465, 1480-81 (9th Cir. 1995). "Failure to give [a jury] instruction which might be proper as a matter of state law," by itself, does not merit federal habeas relief." Menendez v. Terhune, 422 F.3d 1012, 1029 (9th Cir. 2005) (quoting Miller v. Stagner, 757 F.2d 988, 993 (9th Cir. 1985)).

Petitioner cites no specific Supreme Court authority to support his claim of instructional error. As such, the claim is not cognizable unless the alleged error, considered in context of all the instructions and the trial record as a whole, so infected the entire trial that the resulting conviction violates due process. Estelle, 502 U.S. at 71-72. The category of errors so fundamentally unfair as to violate due process is narrowly drawn. Id. at 72-73. In addition, on federal habeas review, no relief can be granted for instructional error without a showing the error had a "substantial and injurious effect or influence in determining the jury's verdict." Calderon v. Coleman, 525 U.S. 141, 147 (1998) (citing Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).

In this case, the state court reasonably determined the defense-proposed modifications were adequately covered in the instructions considered as a whole. Petitioner's argument that the general instructions did not "explicitly address" his proposed additional modifications are understood in the sense that the exact same language as proposed is not used elsewhere in the instructions. His assertion that the refusal to give the proposed modifications precluded the jury from having an instructional basis to evaluate the minor victim's credibility, however, must be rejected for the reasons set forth by the state court of appeal. The state court reasonably determined the jury was adequately instructed to consider the victim's age as well as possible influences on her testimony. These areas of dispute were also the subject of the defense expert witness's testimony. (See Dias, 2018 WL 6716526, at *3-4 (describing Dr. Coleman's testimony).) As the state court additionally noted, defense counsel was free to argue the concepts,

which were generally covered in the instructions, and did so. (Id. at 7.) Under these circumstances, the trial court's decision did not render the trial fundamentally unfair or have a substantial and injurious effect or influence on the jury's verdict. See Estelle, 502 U.S. at 71-72; Coleman, 525 U.S. at 147 (citing Brecht, 507 U.S. at 637).

**III.  Cumulative Error**

Petitioner claims the cumulative effect of the two alleged errors resulted in constitutional prejudice. (ECF No. 1 at 41-43.) The state court of appeal implicitly rejected this claim by finding no individual errors. See Harrington, 562 U.S. at 99.

The Ninth Circuit has concluded that under clearly established precedent of the United States Supreme Court, the combined effect of multiple trial errors may give rise to a due process violation if the trial was rendered fundamentally unfair, even where each error considered individually would not require reversal. Parle v. Runnels, 505 F.3d 922, 927 (9th. Cir. 2007) (citing Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) and Chambers v. Mississippi, 410 U.S. 284, 290 (1973)). "The fundamental question in determining whether the combined effect of trial errors violated a defendant's due process rights is whether the errors rendered the criminal defense 'far less persuasive,' Chambers, 410 U.S. at 294, and thereby had a 'substantial and injurious effect or influence' on the jury's verdict." Parle, 505 F.3d at 927 (quoting Brecht, 507 U.S. at 637).

Each of petitioner's claimed errors has been addressed and no error of constitutional magnitude has been found. "[W]here there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation." Fuller v. Roe, 182 F.3d 699, 704 (9th Cir. 1999), overruled on other grounds by Slack v. McDaniel, 529 U.S. 473 (2000). Since there was no single error of constitutional magnitude committed in this case, there likewise was no cumulative error.

**CONCLUSION**

Petitioner fails to meet the standards set out in 28 U.S.C. § 2254(d) by showing the state court decision on any claim was contrary to or an unreasonable application of clearly established law as determined by the Supreme Court, or resulted in a decision based on an unreasonable

determination of the facts. Accordingly, IT IS RECOMMENDED the petition for a writ of habeas corpus (ECF No. 1) be denied.

These findings and recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within 30 days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served on all parties and filed with the court within seven (7) days after service of the objections. Failure to file objections within the specified time may waive the right to appeal the District Court's order. Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991). In the objections, the party may address whether a certificate of appealability should issue in the event an appeal of the judgment in this case is filed. See Rule 11, Rules Governing § 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

Dated:  September 16, 2021

DLB7
dias0410.fr

DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE